The STATE of Ohio, Appellee,

v.

SCOTT, Appellant.

[Cite as *State v. Scott* (1997), 123 Ohio App.3d 331.]

Court of Appeals of Ohio,
Second District, Montgomery County.

No. 16261.

Decided Sept. 12, 1997.

332

*F. Jay Newberry*, Kettering City Prosecutor, and *Andrew J. Schweller*, Legal Intern, for appellee.

*Thomas W. Condit*, for appellant.

---

FAIN, Judge.

Defendant-appellant Kenneth T. Scott appeals from his conviction and sentence, following a bench trial, for disturbing the peace and for disorderly conduct, in violation of the codified ordinances of the city of Kettering, Ohio. Scott contends that the trial court erred in denying him the right to a jury trial, that the conduct for which he was convicted is protected free speech under the First Amendment to the United States Constitution, and that the trial court erred in denying his request for additional time to prepare for trial.

We conclude that there is evidence in the record from which the trial court could conclude, as it evidently did, that the volume of Scott's speech violated a reasonable restriction on the manner of his speaking, which restriction is permitted by the First Amendment to the United States Constitution. However, we also conclude that Scott was erroneously denied his right to a jury trial.

Accordingly, the judgment of the trial court is reversed, and this cause is remanded for a jury trial. In view of our disposition of these assignments of error, we find it unnecessary to reach Scott's additional claim that the trial court erred in denying his request for additional time to prepare for trial.

## I

On October 17, 1996, at about 1:30 in the afternoon, Scott, along with others, was in front of the Women's Medical Center in Kettering, Ohio. The Center includes an abortion clinic. Scott, along with others, held a sign protesting abortion. Scott was at a place where members of the public were permitted to be, and to express their views on abortion.

The Kettering Police Department received calls from persons living or working in the neighborhood, who were complaining about the noise of Scott's "yelling." Several police officers went to the scene and asked Scott to lower his voice. One police officer made a videotape, which was received in evidence at the trial.

Several people at the scene complained about the noise level of Scott's remarks. The complaints were not about the content of Scott's remarks, but their loudness. Emily Gilley, a secretary in an office located across the street, could hear Scott's yelling despite the fact that the windows of her office were closed. Although she tried moving to various places within her office, the noise of Scott's yelling and "screaming" could be heard everywhere within the office, and interfered with her work.

One of the police officers, Michael Robertson, concluded that the noise Scott was making was so loud that people who were trying to attend to their normal daily business were annoyed or inconvenienced to the point where their daily activity was interrupted.

Scott was arrested and charged with disturbing the peace and disorderly conduct, in violation of Codified Ordinances of Kettering, Ohio. He was arraigned the same day. At his arraignment, he orally requested a jury trial.

Trial was set for October 25, 1996, eight days after the arraignment. The entry setting the trial date is in the record, and was file-stamped on October 22, 1996. Nothing in the record indicates when it was received by Scott, but Scott did appear at the scheduled time and place for trial on October 25, 1996. Scott waived his right to counsel, and appeared *pro se* during the proceedings. At one point, the following colloquy was had:

"SCOTT: Um, yes, we'll start off with again, in front of the first Judge I had put in a request for a jury trial, and I would like, since I requested a jury trial, to have a jury.

"COURT: There is no jury demand filed in this case.

"SCOTT: Well, again, I verbally put in the request in front of the other Judge. I went, when I was signing in for my bond or release, that they didn't allow jury trials in this courtroom. Again, I can't believe, this is still within a ten day limit. You're allowed ten days to put in a motion in any trial. They have caused this to go into a speedy trial mode and uh, because of that, it's still within the ten days, because I was arrested last Thursday. For that purpose I still have the written, and I can write out a motion right now, because I'm within the time limits, your Honor, and I can put in a request for a jury trial.

"COURT: Oral motion for a jury trial is overruled as being out of time."

Scott also unsuccessfully requested additional time to prepare for trial. The trial proceeded, with Scott participating *pro se*. At the conclusion of the trial, the trial court found Scott guilty as charged. The trial court imposed a fine of $250 and a jail sentence of thirty days on each of the charges, but stayed the sentence pending appeal, upon the posting of a bond in the amount of $1,000. From his conviction and sentence, Scott appeals.

## II

Scott's First Assignment of Error is as follows:

"The trial court erred by overruling defendant's request for a trial by jury."

■ The right to trial by jury is venerated in both the Sixth Amendment to the Constitution of the United States, and Section 5, Article I of the Ohio Constitution. However, the right to a jury trial may be waived, and, in petty offense cases, the right to a jury trial is waived unless a demand for a jury is made in accordance with Crim.R. 23(A). That rule provides as follows:

"In petty offense cases, where there is a right of jury trial, the defendant shall be tried by the court unless he demands a jury trial. Such demand must be in writing and filed with the clerk of court not less than ten days prior to the date set for trial, *or on or before the third day following receipt of notice of the date set for trial, whichever is later.* Failure to demand a jury trial as provided in this subdivision is a complete waiver of the right thereto." (Emphasis added.)

■ Thus, in accordance with Crim.R. 23(A), Scott had until three days after his receipt of notice of the date set for trial within which to make a written demand for a jury. We cannot determine, from this record, when Scott received notice of the date set for trial. However, the notice itself was file-stamped on October 22, 1996, so we must presume that it could not have been received prior to that date. Therefore, Scott had at least until three days thereafter, October

25, 1996, coincidentally the trial date itself, by which to file a written demand for a jury trial.

When Scott was informed by the court that there was no demand for a jury trial in the file, he offered to write out a jury demand then and there and file it with the court. His offer was refused. Because of the rapidity with which his case was set for trial, he was still within the time prescribed by rule for filing a written jury demand when he offered to do so.

The state argues, and we agree, that one evident purpose of Crim.R. 23(A) is to preclude a last-minute jury demand made too late, in relation to the trial date, to arrange for the empaneling of a jury. However, Crim.R. 23(A) provides that the defendant shall have not less than three days after receipt of the notice of trial date within which to demand a jury. Therefore, the unfortunate situation that resulted on the day of trial was not the result of any untimeliness on Scott's part, who had indicated his intention to demand a jury trial on the day he was arrested and arraigned, but was instead a result of the rapidity with which this case was set for trial.

■ Because of the fundamental importance of the right to a jury trial, see *Tallmadge v. DeGraft–Biney* (1988), 39 Ohio St.3d 300, 301–302, 530 N.E.2d 1310, 1311–1312, a waiver of the right to a jury should not lightly be inferred. In the case before us, we conclude that Scott's proffered willingness to file a written jury demand, which would have been timely under Crim.R. 23(A), preserved his right to a jury trial, and precluded a waiver thereof.

Scott's First Assignment of Error is sustained.

### III

Scott's Second and Third Assignments of Error are as follows:

"The trial court erred by finding that speech protected under the United States Constitution constitutes disturbing the peace."

"The trial court erred by finding that speech protected under the United States Constitution constitutes disorderly conduct."

The offense of disturbing the peace, of which Scott was found guilty, is proscribed by 648.05 of the Kettering Codified Ordinances 648.05, as follows:

"(a) No person shall disturb the good order and quiet of the Municipality by clamors or noises, by intoxication, drunkenness, fighting, quarreling, wrangling, committing assault, assault and battery, using obscene or profane language in the streets and other public places to the annoyance of the citizens, or otherwise violate the public peace by indecent and disorderly conduct, by lewd and lascivious behavior or by making, continuing to make or causing to be made any

unreasonable and unnecessary noise of such a character, intensity and duration as to disturb the peace and quiet of the community or to be detrimental to the life or health of any individual.

"(b) The following acts are declared to be unreasonable and unnecessary noises in violation of subsection (a) hereof, but this enumeration shall not be deemed exclusive:

"* * *

"(4) *Yelling, Shouting, etc.* Yelling, shouting, hooting, whistling or singing on the public streets, particularly between the hours of 11:00 p.m. and 7:00 a.m. of the following day, or at any time or place so as to annoy or disturb the quiet, comfort or repose of persons in any office, dwelling, hotel or other type of residence or of any persons in the vicinity."

The offense of disorderly conduct, of which Scott was convicted, is proscribed by Kettering Codified Ordinances 648.04, as follows:

"(a) No person shall recklessly cause inconvenience, annoyance or alarm to another, by doing any of the following:

"* * *

"(2) Making unreasonable noise or offensively coarse utterance, gesture or display, or communicating unwarranted and grossly abusive language to any person."

From our review of the trial transcript, it is clear that the gravamen of the complaint against Scott had nothing to do with the content of his remarks, but had exclusively to do with the volume at which those remarks were uttered. There is testimony in the record that, if believed, would persuade the average mind, beyond reasonable doubt, that Scott's remarks were unreasonably noisy, thereby causing inconvenience and annoyance to others. Furthermore, since Scott persisted in uttering his noisy remarks after police officers asked him to lower his voice, we are satisfied that the evidence in the record would support a finding that Scott was reckless in that regard. Thus, there is evidence in the record from which the trier of fact could find, as it did, that Scott committed the offense of disorderly conduct.

The same evidence would support a reasonable conclusion by the fact finder that Scott was yelling or shouting on a public street at a time and place so as to annoy or disturb the quiet, comfort or repose of persons in any office, dwelling, or other type of residence or of any persons in the vicinity. Thus, there is evidence in the record from which the trier of fact could find, as it did, that Scott committed the offense of disturbing the peace.

We note that we have reviewed the videotape of Scott that was made by one of the police officers at the scene. In our view, the videotape is inconclusive. It is consistent with the testimony of witnesses for the state, to the effect that Scott was yelling and shouting so loudly as to cause inconvenience and annoyance to others, but it does not, by itself, prove that fact.

▓▓ In connection with his Second and Third Assignments of Error, Scott contends that his speech, even if it violated the Kettering ordinances proscribing disorderly conduct and disturbing the peace, was protected under the First Amendment to the United States Constitution. Scott concedes, as he must, that government may impose reasonable time, place, and manner restrictions on speech if those restrictions are content-neutral, narrowly tailored to serve significant governmental interests, and leave open ample alternative means of communication. *United States v. Grace* (1983), 461 U.S. 171, 103 S.Ct. 1702, 75 L.Ed.2d 736.

Scott relies upon *Edwards v. South Carolina* (1963), 372 U.S. 229, 83 S.Ct. 680, 9 L.Ed.2d 697, for the proposition that the ordinances of which he was convicted infringed upon his constitutionally protected right of free speech, free assembly, and freedom to petition for redress of grievances. In *Edwards*, the defendants had been convicted of breach of the peace, under the law of South Carolina. That offense had been defined by the Supreme Court of South Carolina as follows:

"In general terms, a breach of the peace is a violation of public order, a disturbance of the public tranquility, by any act or conduct inciting to violence * * *; it includes any violation of any law enacted to preserve peace and good order. It may consist of an act of violence or an act likely to produce violence. It is not necessary that the peace be actually broken to lay the foundation for a prosecution for this offense. If what is done is unjustifiable and unlawful, tending with sufficient directness to break the peace, no more is required. Nor is actual personal violence an essential element in the offense. * * *

"By 'peace,' as used in the law in this connection, is meant the tranquility enjoyed by citizens of a municipality or community where good order reigns among its members, which is the natural right of all persons in political society." *State v. Edwards* (1961), 239 S.C. 339, 343–344, 123 S.E.2d 247, 249.

Thus, the gravamen of the offense with which the defendants were charged in *Edwards*, was acts or conduct inciting to violence. The United States Supreme Court accepted South Carolina's proposition that the acts of the defendants in that case constituted the offense for which they were convicted, but concluded that their conduct was nevertheless protected free speech under the First Amendment. The defendants in *Edwards*, one hundred eighty-seven in number, had assembled at the South Carolina State House grounds, an area of two city

blocks open to the general public. For a period of time about a half an hour to forty-five minutes, the defendants, in small groups of about fifteen, walked single file or two abreast in an orderly way, each group carrying placards with such · messages as "I am proud to be a Negro" and "Down with segregation." There is no indication in the opinion in *Edwards* that the defendants, up to this point, had been unreasonably noisy, or that anyone had been annoyed or inconvenienced due to noise. At this point, the police authority advised the defendants that they would be arrested if they did not disperse within fifteen minutes. Instead of dispersing, the defendants "engaged in what the City Manager described as 'boisterous,' 'loud,' and 'flamboyant,' acts, which, as his later testimony made clear, consisted of listening to a 'religious harangue' by one of their leaders, and loudly singing 'The Star Spangled Banner' and other patriotic and religious songs while stomping their feet and clapping their hands." There is no indication, in the opinion in *Edwards,* that the loudness of these activities annoyed or inconvenienced anyone. The United States Supreme Court held that "these petitioners were convicted of an, offense so generalized as to be, in the words of the South Carolina Supreme Court, 'not susceptible of exact definition,' and they were convicted upon evidence which showed no more than that the opinions which they were peaceably expressing were sufficiently opposed to the views of the majority of the community to attract a crowd and necessitate police protection." *Id.,* 372 U.S. at 237, 83 S.Ct. at 684, 9 L.Ed.2d at 703.

In our view, the situation in *Edwards* was altogether different from the situation in the case before us. The gravamen of the offense with which the defendants in *Edwards* were charged was that their conduct and remarks had a tendency to incite to violence. The United States Supreme Court held that any tendency of their conduct to elicit violence was due to the controversial nature of the opinions expressed, in the view of the surrounding community, rather than the manner in which those views were expressed.

In the case before us, the evidence in the record overwhelmingly suggests that it was not the content of Scott's remarks, but the loudness of their utterance, that caused inconvenience and annoyance to others in the area, even to one secretary who was inside an office across the street, with the windows shut.

Scott argues that he was forced to yell as loudly as he did in order to make himself heard to persons entering the abortion clinic by a rear door. In our view, the First Amendment does not require that a person exercising the right of free speech be guaranteed the opportunity to communicate with any other person, under any circumstances, but rather that the speaker be afforded a reasonable opportunity to make his views known in a public forum. Otherwise, Scott could argue that his need to communicate his antiabortion message to a person already inside the abortion clinic, intending to have an abortion, would

entitle him to use sound amplification equipment capable of penetrating even the most sound-proofed interior. This would go well beyond the reasonable opportunity to utter his views in a public forum guaranteed by the First Amendment. Indeed, such an expansive interpretation of Scott's First Amendment rights would likely have made it impossible for other persons in the vicinity to communicate with those who would be interested in listening. Reasonable, content-neutral noise restrictions make it possible for all persons to exercise their First Amendment rights to free speech, not just those with the loudest voices or loudest sound amplification equipment.

Scott's Second Assignment and Third Assignments of Error are overruled.

## IV

Scott's Fourth Assignment of Error is as follows:

"The trial court erred to the prejudice of defendant–appellant by overruling his request for additional time to obtain and/or evaluate further discovery and to identify and prepare defense witnesses."

In connection with this assignment of error, Scott argues that the rush to trial, just eight days after his alleged offense and arraignment, made it impossible for him to obtain timely discovery, or otherwise to prepare adequately for trial. Although we have some sympathy for Scott's argument, we find it unnecessary to rule upon this assignment of error, in view of our disposition of Scott's First Assignment of Error.

Scott's Fourth Assignment of Error is overruled as moot.

## V

Scott's First Assignment of Error having been sustained, his Second and Third Assignments of Error having been overruled, and his Fourth Assignment of Error having been overruled as moot, the judgment of the trial court is reversed, and this cause is remanded for further proceedings consistent with this opinion.

*Judgment reversed*
*and cause remanded.*

BROGAN and GRADY, JJ., concur.